# UNITED STATES DISTRICT COURT

for the
Western District of Oklahoma

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched<br>or identify the person by name and address)*<br>1924 West Carolina Avenue, Chickasha, Oklahoma 73018 WITH<br>ACCESS AND CONTROL OF THE ATTACHED GARAGE, ALL<br>OUTBUILDINGS, VEHICLES, AND CURTILAGE | )<br>)<br>)<br>)<br>)<br>)<br>)    Case No. MJ-24-**76**-STE |

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A, which is attached and incorporated by reference herein.

located in the _____ Western _____ District of _____ Oklahoma _____ , there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B, which is attached and incorporated by reference herein.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| *Code Section* | *Offense Description* |
|---|---|
| 18 U.S.C. s. 2251(a) and (e) | Attempted Sexual Exploitation of a Minor |

The application is based on these facts:

See Affidavit of FBI Special Agent Steve Carrick, which is attached and incorporated by reference herein.

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

Steve Carrick, Special Agent, FBI
*Printed name and title*

Sworn to before me and signed in my presence.

Date: **Feb 1, 2024**

City and state: ~~_____~~ **Lawton, OK**

_____
*Judge's signature*

SHON T. ERWIN, U.S. MAGISTRATE JUDGE
*Printed name and title*

MJ-24-76

## AFFIDAVIT IN SUPPORT OF AN APPLICATION FOR A SEARCH WARRANT

I, Steven Carrick, a Special Agent of the Federal Bureau of Investigation ("FBI"), Oklahoma City Division, being duly sworn, state:

### AFFIANT'S EXPERIENCE

1.      I have been employed as a Special Agent with the FBI since February 2022 and have been assigned to the Oklahoma City Division of the FBI since June 2022.  I completed four months of training at the FBI Academy in Quantico, Virginia.  During the training, I received instruction in a variety of investigative techniques commonly used in support of a wide range of the FBI's investigative priorities.   The training included instruction regarding the use of confidential human sources, electronic and physical surveillance techniques, law enforcement tactics, search and seizure laws and techniques, interviewing strategies and skills, forensic techniques, and a variety of other subjects.  As a federal agent, I am authorized to investigate violations of laws of the United States, and I am a law enforcement officer with the authority to execute warrants issued under the authority of the United States.    Prior to my employment with the FBI, I was a Police Officer in Nashville, Tennessee for nine years.   I spent four of those years investigating crimes against children, to include physical abuse, sexual abuse, and homicide.

### PURPOSE OF AFFIDAVIT

2.      I have probable cause to believe that contraband and evidence of a crime, fruits of a crime, and instrumentalities of violations of 18 U.S.C. §§ 2252(a)(2) and (b)(1) (distribution and/or receipt of a visual depiction of a minor engaged in sexually explicit conduct); 18 U.S.C. §§ 2252(a)(4)(B) and (b)(2) (possession of and access with intent to view a visual depiction of a minor engaged in sexually explicit conduct); 18 U.S.C. § 2252A(a)(2)(A) and (b)(1) (distribution and/or receipt of child pornography (and attempt)); and 18 U.S.C. § 2252A(a)(5)(B) and (b)(2)

(possession of and access with intent to view child pornography (and attempt)) are presently located within 1924 West Carolina Avenue Chickasha, Oklahoma 73018 (hereinafter, the "**SUBJECT PREMISES**").  I submit this application and Affidavit in support of a search warrant authorizing a search of the **SUBJECT PREMISES**, as further described in Attachments A and B, incorporated herein by reference, which is located in the Western District of Oklahoma.  Located within the **SUBJECT PREMISES** to be searched, I seek to seize evidence, fruits, and instrumentalities of the foregoing criminal violations.  I request authority to search the entire **SUBJECT PREMISES**, including the residential dwelling and premises structures, where the items specified in Attachment B may be found, and to seize all items listed in Attachment B as contraband and instrumentalities, fruits, and evidence of crime.

3.     Since this Affidavit is being submitted for the limited purpose of securing a search warrant, I have not included each and every fact known to me concerning this investigation.   I have set forth only the facts that I believe are necessary to establish probable cause to support the issuance of a search warrant.

## STATUTORY AUTHORITY

4.     As noted above, this investigation concerns alleged violations of the following:

a.     18 U.S.C. §§ 2252(a)(2) and (b)(1) prohibit any person from knowingly receiving or distributing, or attempting or conspiring to receive or distribute, any visual depiction using any means or facility of interstate or foreign commerce, or that has been mailed or shipped or transported in or affecting interstate or foreign commerce, or which contains materials which have been mailed or so shipped or transported, by any means including by computer, or knowingly reproducing any visual depiction for distribution using any means or facility of interstate or foreign commerce, or in or affecting interstate or foreign commerce or through the mails, if the production

2

of such visual depiction involved the use of a minor engaging in sexually explicit conduct and such visual depiction is of such conduct.

       b.    18 U.S.C. §§ 2252(a)(4)(B) and (b)(2) prohibit any person from knowingly possessing or accessing with the intent to view, or attempting or conspiring to possess or access with the intent to view, 1 or more books, magazines, periodicals, films, video tapes, or other matter which contain any visual depiction that has been mailed, or has been shipped or transported using any means or facility of interstate or foreign commerce or in or affecting interstate or foreign commerce, or which was produced using materials which have been mailed or so shipped or transported, by any means including by computer, if the production of such visual depiction involved the use of a minor engaging in sexually explicit conduct and such visual depiction is of such conduct.

       c.    18 U.S.C. §§ 2252A(a)(2)(A) and (b)(1) prohibit a person from knowingly receiving or distributing, or attempting or conspiring to receive or distribute, any child pornography or any material that contains child pornography, as defined in 18 U.S.C. § 2256(8), that has been mailed, or using any means or facility of interstate or foreign commerce shipped or transported in or affecting interstate or foreign commerce by any means, including by computer.

       d.    18 U.S.C. §§ 2252A(a)(5)(B) and (b)(2) prohibit a person from knowingly possessing or knowingly accessing with intent to view, or attempting or conspiring to do so, any material that contains an image of child pornography, as defined in 18 U.S.C. § 2256(8), that has been mailed, or shipped or transported using any means or facility of interstate or foreign commerce or in or affecting interstate or foreign commerce by any means, including by computer, or that was produced using materials that have been mailed or shipped or transported in or affecting interstate or foreign commerce by any means, including by computer.

## DEFINITIONS

5.      The following definitions apply to this Affidavit and Attachment B:

a.      "Child erotica," as used herein, means materials or items that are sexually arousing to persons having a sexual interest in minors but that are not necessarily obscene or do not necessarily depict minors in sexually explicit poses or positions.

b.      "Child pornography," as defined in 18 U.S.C. § 2256(8), is any visual depiction of sexually explicit conduct where (a) the production of the visual depiction involved the use of a minor engaged in sexually explicit conduct, (b) the visual depiction is a digital image, computer image, or computer-generated image that is, or is indistinguishable from, that of a minor engaged in sexually explicit conduct, or (c) the visual depiction has been created, adapted, or modified to appear that an identifiable minor is engaged in sexually explicit conduct.

c.      "Computer," as used herein, refers to "an electronic, magnetic, optical, electrochemical, or other high speed data processing device performing logical or storage functions, and includes any data storage facility or communications facility directly related to or operating in conjunction with such device" and includes smartphones, and mobile phones and devices.   *See* 18 U.S.C. § 1030(e)(1).

d.      "Computer hardware," as used herein, consists of all equipment that can receive, capture, collect, analyze, create, display, convert, store, conceal, or transmit electronic, magnetic, or similar computer impulses or data.   Computer hardware includes any data-processing devices (including central processing units, internal and peripheral storage devices such as fixed disks, external hard drives, floppy disk drives and diskettes, and other memory storage devices); peripheral input/output devices (including keyboards, printers, video display monitors, and related

4

communications devices such as cables and connections); as well as any devices, mechanisms, or parts that can be used to restrict access to computer hardware (including physical keys and locks).

e.    The "Internet" is a global network of computers and other electronic devices that communicate with each other.   Due to the structure of the Internet, connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state.

f.    "Internet Protocol address" or "IP address," as used herein, refers to a unique number used by a computer or other digital device to access the Internet.   IP addresses can be "dynamic," meaning that the internet service provider assigns a different unique number to a computer every time it accesses the Internet.   IP addresses might also be "static," if an ISP assigns a user's computer a particular IP address that is used each time the computer accesses the Internet.

g.    "Internet Service Providers" ("ISPs"), as used herein, are commercial organizations that are in business to provide individuals and businesses access to the Internet.   ISPs provide a range of functions for their customers including access to the Internet, web hosting, e-mail, remote storage, and co-location of computers and other communications equipment.

h.    "Minor," as defined in 18 U.S.C. § 2256(1), refers to any person under the age of eighteen years.

i.    "Records," "documents," and "materials," as used herein, include all information recorded in any form and by any means, whether in handmade, photographic, mechanical, electrical, electronic, or magnetic form.

j.    "Sexually explicit conduct," as defined in 18 U.S.C. § 2256(2), means actual or simulated (a) sexual intercourse, including genital-genital, oral-genital, anal-genital, or oral-anal, whether between persons of the same or opposite sex; (b) bestiality; (c) masturbation; (d)

5

sadistic or masochistic abuse; or (e) lascivious exhibition of the genitals or pubic area of any person.

        k.    "Visual depiction," as defined in 18 U.S.C. § 2256(5), includes undeveloped film and videotape, data stored on computer disc or other electronic means which is capable of conversion into a visual image, and data which is capable of conversion into a visual image that has been transmitted by any means, whether or not stored in a permanent format.

## BACKGROUND ON KIK MESSENGER

        6.    In a nutshell, KIK Messenger, commonly called KIK, is a freeware instant messaging mobile app from the Canadian company KIK Interactive, available free of charge on iOS and Android operating systems. KIK allows its users to talk to their friends and browse and share photos and videos and other files with their friends on KIK. KIK was founded in 2009 by a group of University of Waterloo students who started a company designed to shift the center of computing from the PC to the phone. According to the website, KIK Messenger, a free service easily downloaded from the Internet, has become the simplest, fastest, most life-like chat experience you can get on a smartphone. Unlike other messengers, KIK usernames, not phone numbers, are the basis for KIK user accounts, so KIK users can control with whom they communicate. In addition, KIK features include more than instant messaging. KIK users can exchange images, videos, sketches, stickers, and more with mobile web pages.

        7.    KIK users are also able to create chat groups with a limited number of individuals to communicate in a group setting and exchange text messages, images and videos. These groups are administered by the group creator who has the authority to remove and ban other users from the created group. Once the group is created, KIK users have the option of sharing a link to the

group that includes all of their contacts or any other user.   These groups are frequently created with a group name containing a hashtag (#) that is easily identifiable or searchable by keyword.

8.     The KIK mobile application is available for download via the App Store for most iOS devices such as iPhones and iPads.   Additionally, the KIK mobile application is available on the Google PlayStore for Android devices. KIK can be used on multiple mobile devices, to include cellular phones and tablets.

9.     In general, providers like KIK ask each of their subscribers to provide certain personal identifying information when registering for an account.   This information can include the subscriber's full name, physical address, and other identifiers such as an e-mail address.

10.     Providers typically retain certain transactional information about the creation and use of each account on their systems.   This information can include the date on which the account was created, the length of service, records of log-in (i.e., session) times and durations, the types of service utilized, the status of the account (including whether the account is inactive or closed), the methods used to connect to the account, and other log files that reflect usage of the account.   In addition, providers often have records of the IP address used to register the account and the IP addresses associated with particular logins to the account.   Because every device that connects to the Internet must use an IP address, IP address information can help to identify which computers or other devices were used to access the account.

11.     KIK offers users the ability to create an identity within the mobile application referred to as a "username."   This username is unique to the account and cannot be changed. No one else can utilize the same username.   A KIK user would have to create a new account in order to obtain a different username.   The username for a particular KIK account holder is displayed in their KIK profile.

12.     According to information provided to HSI by a KIK Law Enforcement Response Team Lead, KIK's Terms of Service prohibit KIK users from uploading, posting, sending, commenting on, or storing content that contains child pornography and/or child abuse images. The Terms of Service also provide that KIK may review, screen, and delete user content at any time if KIK believes use of their services are in violation of the law.    According to KIK, KIK has a strong business interest in enforcing their Terms of Service and ensuring that their services are free of illegal content, and in particular, child sexual abuse material.    Accordingly, KIK reports that it independently and voluntarily takes steps to monitor and safeguard their platform and that ridding KIK products and services of child abuse images is critically important to protecting their users, product, brand, and business interests.

13.     KIK was located in Ontario, Canada and was governed by Canadian law. According to information contained in the "KIK Interactive, Inc. Child Sexual Abuse and Illegal Material Report and Glossary" (hereinafter KIK Glossary), which KIK provided when reporting information to law enforcement authorities, KIK was mandated to report to the Royal Canadian Mounted Police (RCMP) any images and/or videos that would constitute suspected child pornography under Canadian law which are discovered on the KIK platform.    According to the KIK Glossary, KIK is typically alerted to suspected child pornography on KIK based on digital hash value matches to previously identified child pornography or through reports from other KIK users or third-party moderators.

14.     The RCMP advised HSI agents that upon receiving a report from KIK related to suspected child pornography, the RCMP reviewed the reported IP addresses of the KIK users contained in the KIK reports to determine their location.    The RCMP then provided KIK reports of KIK users in the United States to HSI in Ottawa, Canada, who in turn provided the KIK reports

8

to the HSI Cyber Crimes Center (C3) Child Exploitation Investigations Unit (CEIU) located in Fairfax, Virginia for analysis and dissemination.

15.     In October 2019, KIK was purchased by MediaLab, a company operating in the United States.

## FACTS AND CIRCUMSTANCES OF INVESTIGATION

16.     On January 16, 2024, an FBI Online Covert Employee ("OCE"), in Jacksonville, Florida was connected to the Internet in an undercover capacity.  The OCE connected with a KIK user with username "RyanPipeliner" (hereinafter, the "**SUBJECT ACCOUNT**"), using screenname "R !", who was found to have a sexual interest in children.

17.     During the course of this online undercover session, the **SUBJECT ACCOUNT** shared three photos with the OCE that were taken in the same bathroom, of an unknown Caucasian female, with light brown to dark blonde hair, with her breasts, buttocks, and vaginal area exposed. In two of the photos, the female's breasts were fully exposed.  In one of the photos, the female's buttocks are fully exposed.  The female's vaginal area was displayed in one of the photos where her breasts were also exposed.  It did not appear the female was aware the photos were being taken.

18.     The FBI OCE commented, "Hey nice hidden cam pics."  The user of the **SUBJECT ACCOUNT** replied, "More like videos that I took stills from [laughing emoji] thanks."  The FBI OCE replied, "Oh for real?  Your vids?"  The **SUBJECT ACCOUNT** responded, "Yes" and indicated that it was his stepdaughter.

## TARGET IDENTIFICATION

19.     Agents issued an emergency disclosure request to KIK and requested any IP logs for user information related to the **SUBJECT ACCOUNT**.  The results identified that the

**SUBJECT ACCOUNT** utilized IP address 174.210.0.33 on Friday, January 16, 2024 at 3:08 p.m. CST.

20.     Law enforcement determined that the IP address belonged to Verizon.    Agents issued a subpoena to Verizon for subscriber information regarding the **SUBJECT ACCOUNT**. The results from Verizon identified that IP address 174.210.0.33, which was utilized on Friday, January 16, 2024 at 3:08 p.m. CST, resolved to the account of Ryan Rudick ("RYAN"), whose listed address is 1924 West Carolina Ave, Chickasha, Oklahoma 73018 (the **SUBJECT PREMISES**) and listed phone number is 918-315-1943.

21.     Subsequent investigation revealed that RYAN has a 15-year-old step-daughter, which is supported by local school records.  Furthermore, school records list the child's mother as Tara Trembath Rudick.  Upon a social media search, agents were able to locate photographs of RYAN's 15-year-old step-daughter, who is a Caucasian female, with light brown to dark blonde hair, who visually matches the female in the photos shared on KIK.  Law enforcement thus identified RYAN as the suspect in its investigation of the user of the **SUBJECT ACCOUNT** who distributed child pornography to the OCE on January 16, 2024.

22.     A check of publicly available databases was run on January 26, 2024 and revealed that RYAN and Tara Rudick still reside at the **SUBJECT PREMISES**.

23.     On January 26, 2024, law enforcement conducted a search for RYAN in a public records database, which provides information, such names, dates of birth, addresses, associates, telephone numbers, and email addresses.  The search indicated that RYAN's possible address is the **SUBJECT PREMISES**, his DOB is xx/xx/1989, and his Social Security Account Number is xx4736.

24.     A check with the City of Chickasha Utility Services database revealed the service

address of 1924 West Carolina Ave, Chickasha, Oklahoma 73018, was billed to Tara Rudick and listed RYAN as the spouse.

25.    Two vehicles in the driveway of the **SUBJECT PREMISES,** a black 2014 Ram 1500 bearing Cherokee Nation license plate CS0879 and a 2020 white Ford Explorer bearing Cherokee Nation license plate CW3617, registered to RYAN.

## BACKGROUND ON CHILD PORNOGRAPHY, COMPUTERS, AND THE INTERNET

26.    I have had both training and experience in the investigation of computer-related crimes.  Based on my training, experience, and knowledge, I know the following:

a.    Computers and digital technology are the primary way in which individuals interested in child pornography interact with each other. Computers basically serve four functions in connection with child pornography:  production, communication, distribution, and storage.

b.    Digital cameras and smartphones with cameras save photographs or videos as a digital file that can be directly transferred to a computer by connecting the camera or smartphone to the computer with a cable or via wireless connections, such as "Wi-Fi" or "Bluetooth." Photos and videos taken on a digital camera or smartphone may be stored on a removable memory card in the camera or smartphone.  These memory cards are often large enough to store thousands of high-resolution photographs or videos.

c.    A device known as a modem allows any computer to connect to another computer using a telephone, cable, or wireless connection.  Mobile devices such as smartphones and tablet computers may also connect to other computers via wireless connections.  Electronic contact can be made to literally millions of computers around the world. Child pornography can therefore be easily, inexpensively, and anonymously (through electronic communications) produced, distributed, and received by anyone with access to a computer or smartphone.

d.  The computer's ability to store images in digital form makes the computer itself an ideal repository for child pornography.  Electronic storage media of various types – to include computer hard drives, external hard drives, CDs, DVDs, and "thumb," "jump," or "flash" drives, which are very small devices plugged into a port on the computer – can store thousands of images or videos at very high resolution.  It is extremely easy for an individual to take a photo or a video with a digital camera or camera-bearing smartphone, upload that photo or video to a computer, and then copy it (or any other files on the computer) to any one of those media storage devices.  Some media storage devices can easily be concealed and carried on an individual's person. Smartphones and/or mobile phones are also often carried on an individual's person.

e.  The Internet affords individuals several different venues for obtaining, viewing, and trading child pornography in a relatively secure and anonymous fashion.

f.  Individuals also use online resources to retrieve and store child pornography. Some online services allow a user to set up an account with a remote computing service that may provide e-mail services and/or electronic storage of computer files in any variety of formats.  A user can set up an online storage account (sometimes referred to as "cloud" storage) from any computer or smartphone with access to the Internet.  Even in cases where online storage is used, however, evidence of child pornography can be found on the user's computer, smartphone, or external media in most cases.

g.  As is the case with most digital technology, communications by way of computer can be saved or stored on the computer used for these purposes.  Storing this information can be intentional (*i.e.*, by saving an e-mail as a file on the computer or saving the location of one's favorite websites in, for example, "bookmarked" files).  Digital information can also be retained unintentionally, such as the traces of the path of an electronic communication, which may be

automatically stored in many places (*e.g.*, temporary files or ISP client software, among others). In addition to electronic communications, a computer user's Internet activities generally leave traces or "footprints" in the web cache and history files of the browser used. Such information is often maintained indefinitely until overwritten by other data.

## SPECIFICS OF SEARCH AND SEIZURE OF COMPUTER SYSTEMS

27.    As described above and in Attachment B, this application seeks permission to search for records that might be found on the **SUBJECT PREMISES** in whatever form they are found. One form in which the records might be found is data stored on a computer's hard drive or other storage media. Thus, the warrant applied for would authorize the seizure of electronic storage media or, potentially, the copying of electronically stored information, all under Rule 41(e)(2)(B).

28.    I submit that if a computer or storage medium is found on the **SUBJECT PREMISES**, there is probable cause to believe those records will be stored on that computer or storage medium, for at least the following reasons:

a.    Based on my knowledge, training, and experience, I know that computer files or remnants of such files can be recovered months or even years after they have been downloaded onto a storage medium, deleted, or viewed via the Internet. Electronic files downloaded to a storage medium can be stored for years at little or no cost. Even when files have been deleted, they can be recovered months or years later using forensic tools. This is so because when a person "deletes" a file on a computer, the data contained in the file does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data.

b.    Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space—that is, in space on the storage medium that is not currently being used by an active file—for long periods of time before they are overwritten. In addition, a computer's operating

system may also keep a record of deleted data in a "swap" or "recovery" file.

c.    Wholly apart from user-generated files, computer storage media—in particular, computers' internal hard drives—contain electronic evidence of how a computer has been used, what it has been used for, and who has used it.  To give a few examples, this forensic evidence can take the form of operating system configurations, artifacts from operating system or application operation, file system data structures, and virtual memory "swap" or paging files.  Computer users typically do not erase or delete this evidence, because special software is typically required for that task.  However, it is technically possible to delete this information.

d.    Similarly, files that have been viewed via the Internet are sometimes automatically downloaded into a temporary Internet directory or "cache."

29.    As further described in Attachment B, this application seeks permission to locate not only computer files that might serve as direct evidence of the crimes described on the warrant, but also for forensic electronic evidence that establishes how computers were used, the purpose of their use, who used them, and when.  There is probable cause to believe that this forensic electronic evidence will be on any storage medium in the **SUBJECT PREMISES** because:

a.    Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file).  Virtual memory paging systems can leave traces of information on the storage medium that show what tasks and processes were recently active. Web browsers, e-mail programs, and chat programs store configuration information on the storage medium that can reveal information such as online nicknames and passwords.   Operating systems can record additional information, such as the attachment of peripherals, the attachment of USB flash storage devices or other external storage media, and the

14

times the computer was in use. Computer file systems can record information about the dates files were created and the sequence in which they were created, although this information can later be falsified.

b.     As explained herein, information stored within a computer and other electronic storage media may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion. In my training and experience, information stored within a computer or storage media (e.g., registry information, communications, images and movies, transactional information, records of session times and durations, internet history, and anti-virus, spyware, and malware detection programs) can indicate who has used or controlled the computer or storage media. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. The existence or absence of anti-virus, spyware, and malware detection programs may indicate whether the computer was remotely accessed, thus inculpating, or exculpating the computer owner. Further, computer and storage media activity can indicate how and when the computer or storage media was accessed or used. For example, as described herein, computers typically contain information that log computer user account session times and durations, computer activity associated with user accounts, electronic storage media that connected with the computer, and the IP addresses through which the computer accessed networks and the internet. Such information allows investigators to understand the chronological context of computer or electronic storage media access, use, and events relating to the crime under investigation. Additionally, some information stored within a computer or electronic storage media may provide crucial evidence relating to the physical location of other evidence and the suspect. For example, images stored on

15

a computer may both show a particular location and have geolocation information incorporated into its file data.    Such file data typically also contains information indicating when the file or image was created.    The existence of such image files, along with external device connection logs, may also indicate the presence of additional electronic storage media (e.g., a digital camera or cellular phone with an incorporated camera).    The geographic and timeline information described herein may either inculpate or exculpate the computer user.    Last, information stored within a computer may provide relevant insight into the computer user's state of mind as it relates to the offense under investigation.    For example, information within the computer may indicate the owner's motive and intent to commit a crime (e.g., internet searches indicating criminal planning), or consciousness of guilt (e.g., running a "wiping" program to destroy evidence on the computer or password protecting/encrypting such evidence in an effort to conceal it from law enforcement).

c.    A person with appropriate familiarity with how a computer works can, after examining this forensic evidence in its proper context, draw conclusions about how computers were used, the purpose of their use, who used them, and when.

d.    The process of identifying the exact files, pieces, registry entries, logs, or other forms of forensic evidence on a storage medium that are necessary to draw an accurate conclusion is a dynamic process.  While it is possible to specify in advance the records to be sought, computer evidence is not always data that can be merely reviewed by a review team and passed along to investigators.    Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves.    Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e.    Further, in finding evidence of how a computer was used, the purpose of its

16

use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium. For example, the presence or absence of counter-forensic programs or anti- virus programs (and associated data) may be relevant to establishing the user's intent.

f.    I know that when an individual uses a computer to obtain or access child pornography, the individual's computer will generally serve both as an instrumentality for committing the crime, and also as a storage medium for evidence of the crime. The computer is an instrumentality of the crime because it is used as a means of committing the criminal offense. The computer is also likely to be a storage medium for evidence of crime. From my training and experience, I believe that a computer used to commit a crime of this type may contain data that is evidence of how the computer was used; data that was sent or received; notes as to how the criminal conduct was achieved; records of Internet discussions about the crime; and other records that indicate the nature of the offense.

30.    Based upon my training and experience and information relayed to me by agents and others involved in the forensic examination of computers, I know that computer data can be stored on a variety of systems and storage devices, including external and internal hard drives, flash drives, thumb drives, micro SD cards, macro SD cards, DVDs, gaming systems, SIM cards, cellular phones capable of storage, floppy disks, compact disks, magnetic tapes, memory cards, memory chips, and online or offsite storage servers maintained by corporations, including but not limited to "cloud" storage. I also know that during the search of the premises it is not always possible to search computer equipment and storage devices for data for several reasons, including the following:

a.    Searching computer systems is a highly technical process which requires specific expertise and specialized equipment. There are so many types of computer hardware and

software in use today that it is impossible to bring to the search site all the technical manuals and specialized equipment necessary to conduct a thorough search. In addition, it may also be necessary to consult with computer personnel who have specific expertise in the type of computer, software website, or operating system that is being searched;

b.     Searching computer systems requires the use of precise, scientific procedures which are designed to maintain the integrity of the evidence and to recover "hidden," erased, compressed, encrypted, or password-protected data. Computer hardware and storage devices may contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed. Since computer data is particularly vulnerable to inadvertent or intentional modification or destruction, a controlled environment, such as a law enforcement laboratory, is essential to conducting a complete and accurate analysis of the equipment and storage devices from which the data will be extracted;

c.     The volume of data stored on many computer systems and storage devices will typically be so large that it will be highly impractical to search for data during the execution of the physical search of the premises; and

d.     Computer users can attempt to conceal data within computer equipment and storage devices through several methods, including the use of innocuous or misleading filenames and extensions. For example, files with the extension ".jpg" often are image files; however, a user can easily change the extension to ".txt" to conceal the image and make it appear that the file contains text. Computer users can also attempt to conceal data by using encryption, which means that a password or device, such as a "dongle" or "keycard," is necessary to decrypt the data into readable form. In addition, computer users can conceal data within another seemingly unrelated and innocuous file in a process called "steganography." For example, by using steganography a

18

computer user can conceal text in an image file which cannot be viewed when the image file is opened. Therefore, a substantial amount of time is necessary to extract and sort through data that is concealed or encrypted to determine whether it is contraband, evidence, fruits, or instrumentalities of a crime.

31.    Additionally, based upon my training and experience and information related to me by agents and others involved in the forensic examination of computers, I know that routers, modems, and network equipment used to connect computers to the Internet often provide valuable evidence of, and are instrumentalities of, a crime. This is equally true of so-called "wireless routers," which create localized networks that allow individuals to connect to the Internet wirelessly. Though wireless networks may be "secured" (in that they require an individual to enter an alphanumeric key or password before gaining access to the network) or "unsecured" (in that an individual may access the wireless network without a key or password), wireless routers for both secured and unsecured wireless networks may yield significant evidence of, or serve as instrumentalities of, a crime—including, for example, serving as the instrument through which the perpetrator of the Internet-based crime connected to the Internet and, potentially, containing logging information regarding the time and date of a perpetrator's network activity as well as identifying information for the specific device(s) the perpetrator used to access the network. Moreover, I know that individuals who have set up either a secured or unsecured wireless network in their residence are often among the primary users of that wireless network.

32.    Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit seizing, imaging, or otherwise copying storage media that reasonably appear to contain some or all of the evidence described in the warrant and would authorize a later review of the media or information consistent with the warrant. The later review may require

techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of a hard drive to human inspection in order to determine whether it is evidence described by the warrant.

## CHARACTERISTICS COMMON TO INDIVIDUALS WHO TRANSPORT, DISTRIBUTE, POSSESS, AND/OR ACCESS WITH INTENT TO VIEW CHILD PORNOGRAPHY

33.    Based on my previous investigative experience related to child exploitation investigations, and the training and experience of other law enforcement officers with whom I have had discussions, I know there are certain characteristics common to individuals who transport, distribute, possess, and/or access with intent to view child pornography:

a.    Such individuals may receive sexual gratification, stimulation, and satisfaction from contact with children, or from fantasies they may have viewing children engaged in sexual activity or in sexually suggestive poses, such as in person, in photographs, or other visual media, or from literature describing such activity.

b.    Such individuals may collect sexually explicit or suggestive materials in a variety of media, including photographs, magazines, motion pictures, videotapes, books, slides and/or drawings or other visual media.  Individuals who have a sexual interest in children or images of children oftentimes use these materials for their own sexual arousal and gratification.   Further, they may use these materials to lower the inhibitions of children they are attempting to seduce, to arouse the selected child partner, or to demonstrate the desired sexual acts.

c.    Such individuals almost always possess and maintain their hard copies of child pornographic material, that is, their pictures, films, video tapes, magazines, negatives, photographs, correspondence, mailing lists, books, tape recordings, etc., in the privacy and security of their home or some other secure location.   Individuals who have a sexual interest in children or

images of children typically retain pictures, films, photographs, negatives, magazines, correspondence, books, tape recordings, mailing lists, child erotica, and videotapes for many years.

d.     Likewise, such individuals often maintain their child pornography images in a digital or electronic format in a safe, secure, and private environment, such as a computer and surrounding area.   These child pornography images are often maintained for several years and are kept close by, usually at the possessor's residence, inside the possessor's vehicle, or, at times, on their person, to enable the individual to view the child pornography images, which are valued highly. Some of these individuals also have been found to download, view, and then delete child pornography on their computers or digital devices on a cyclical and repetitive basis; however, evidence of such activity, including deleted child pornography, often can be located on these individuals' computers and digital devices through the use of forensic tools.

e.     Importantly, evidence of such activity, including deleted child pornography, often can be located on these individuals' computers and digital devices using forensic tools.  Indeed, the very nature of electronic storage means that evidence of the crime is often still discoverable for extended periods of time even after the individual "deleted" it. [1]

f.     Such individuals also may correspond with and/or meet others to share information and materials, rarely destroy correspondence from other child pornography distributors/possessors, conceal such correspondence as they do their sexually explicit material, and often maintain lists of names, addresses, and telephone numbers of individuals with whom they

---

[1] *See United States v. Carroll*, 750 F.3d 700, 706 (7th Cir. 2014) (concluding that 5-year delay was not too long because "staleness inquiry must be grounded in an understanding of both the behavior of child pornography collectors and of modern technology"); *see also United States v. Seiver*, 692 F.3d 774 (7th Cir. 2012) (Posner, J.) (collecting cases, e.g., *United States v. Allen*, 625 F.3d 830, 843 (5th Cir. 2010); *United States v. Richardson*, 607 F.3d 357, 370–71 (4th Cir. 2010); *United States v. Lewis*, 605 F.3d 395, 402 (6th Cir. 2010).)

have been in contact and who share the same interests in child pornography.

g.     Such individuals prefer not to be without their child pornography for any prolonged time period.   This behavior has been documented by law enforcement officers involved in the investigation of child pornography throughout the world.   Thus, even if RYAN uses a portable device (such as a mobile phone) to access the internet and child pornography, it is more likely than not that evidence of this access will be found in his home, the **SUBJECT PREMISES**, as set forth in Attachment A.

## BIOMETRIC ACCESS TO DEVICES

34.     I request that this warrant permit law enforcement to compel any resident located at the **SUBJECT PREMISES** to unlock any electronic devices requiring biometric access subject to seizure pursuant to this warrant.   The grounds for this request are as follows:

a.     I know from my training and experience, as well as from information found in publicly available materials published by device manufacturers, that many electronic devices, particularly newer mobile devices and laptops, offer their users the ability to unlock the device through biometric features in lieu of a numeric or alphanumeric passcode or password.   These biometric features include fingerprint scanners, facial recognition features and iris recognition features.   Some devices offer a combination of these biometric features, and the user of such devices can select which features they would like to utilize.

b.     If a device is equipped with a fingerprint scanner, a user may enable the ability to unlock the device through his or her fingerprints.   For example, Apple offers a feature called "Touch ID," which allows a user to register up to five fingerprints that can unlock a device. Once a fingerprint is registered, a user can unlock the device by pressing the relevant finger to the device's Touch ID sensor, which is found in the round button (often referred to as the "home"

button) located at the bottom center of the front of the device.   The fingerprint sensors found on devices produced by other manufacturers have different names but operate similarly to Touch ID. If a device is equipped with a facial-recognition feature, a user may enable the ability to unlock the device through his or her face.  For example, this feature is available on certain Android devices and is called "Trusted Face."  During the Trusted Face registration process, the user holds the device in front of his or her face.   The device's front-facing camera then analyzes and records data based on the user's facial characteristics.  The device can then be unlocked if the front-facing camera detects a face with characteristics that match those of the registered face.  Facial recognition features found on devices produced by other manufacturers have different names but operate similarly to Trusted Face.

      c.     If a device is equipped with an iris-recognition feature, a user may enable the ability to unlock the device with his or her irises.   For example, on certain Microsoft devices, this feature is called "Windows Hello."  During the Windows Hello registration, a user registers his or her irises by holding the device in front of his or her face.  The device then directs an infrared light toward the user's face and activates an infrared-sensitive camera to record data based on patterns within the user's irises.  The device can then be unlocked if the infrared-sensitive camera detects the registered irises. Iris-recognition features found on devices produced by other manufacturers have different names but operate similarly to Windows Hello.

      d.     In my training and experience, users of electronic devices often enable the aforementioned biometric features because they are considered to be a more convenient way to unlock a device than by entering a numeric or alphanumeric passcode or password.   Moreover, in some instances, biometric features are considered to be a more secure way to protect a device's contents.  This is particularly true when the users of a device are engaged in criminal activities and

23

thus have a heightened concern about securing the contents of a device.

      e.    As discussed in this Affidavit, I have reason to believe that one or more digital devices will be found during the search. The passcode or password that would unlock the electronic devices subject to search under this warrant currently is not known to law enforcement. Thus, law enforcement personnel may not otherwise be able to access the data contained within the electronic devices, making the use of biometric features necessary to the execution of the search authorized by this warrant.

      f.    I also know from my training and experience, as well as from information found in publicly available materials including those published by device manufacturers, that biometric features will not unlock a device in some circumstances even if such features are enabled. This can occur when a device has been restarted, inactive, or has not been unlocked for a certain period of time. For example, certain Apple devices cannot be unlocked using Touch ID when: (1) more than 48 hours has elapsed since the device was last unlocked; or (2) when the device has not been unlocked using a fingerprint for eight hours and the passcode or password has not been entered in the last six days. Similarly, certain Android devices cannot be unlocked with Trusted Face if the device has remained inactive for four hours. Biometric features from other brands carry similar restrictions. Thus, in the event law enforcement personnel encounter a locked device equipped with biometric features, the opportunity to unlock the device through a biometric feature may exist for only a short time.

      g.    Due to the foregoing, if law enforcement personnel encounter any electronic devices that are subject to seizure pursuant to this warrant and may be unlocked using one of the aforementioned biometric features, this warrant permits law enforcement personnel to: (1) press or swipe the fingers (including thumbs) of any resident located at the **SUBJECT PREMISES** to

the fingerprint scanner of the electronic devices found at the **SUBJECT PREMISES**; (2) hold the devices found at the **SUBJECT PREMISES** in front of the face of any resident located at the **SUBJECT PREMISES** and activate the facial recognition feature; and/or (3) hold the devices found at the **SUBJECT PREMISES** in front of the face of any resident located at the **SUBJECT PREMISES** and activate the iris recognition feature, for the purpose of attempting to unlock the devices in order to search the contents as authorized by this warrant. The proposed warrant does not authorize law enforcement to require that residents located at the **SUBJECT PREMISES** state or otherwise provide the password or any other means that may be used to unlock or access the devices. Moreover, the proposed warrant does not authorize law enforcement to require residents located at the **SUBJECT PREMISES** to identify the specific biometric characteristics (including the unique finger(s) or other physical features) that may be used to unlock or access the devices.

## CONCLUSION

35.    Based on the foregoing, there is probable cause to believe that the federal criminal statutes cited herein have been violated, and that the contraband, property, evidence, fruits and instrumentalities of these offenses, more fully described in Attachment B of this Affidavit, are located at the **SUBJECT PREMISES**, described in Attachment A. I respectfully request that this Court issue a search warrant for the **SUBJECT PREMISES**, authorizing the search and the seizure of the items described in Attachment B. *Furthermore, because information collected by law enforcement reflects that both the suspect and victim of the offense reside at the **SUBJECT PREMISES**, I submit there is reasonable cause for this Court to authorize the execution of the warrant as soon as possible, to include at any time in the day or night.*

36.    I am aware that the recovery of data by a computer forensic analyst takes significant time; much the way recovery of narcotics must later be forensically evaluated in a lab, digital evidence will also undergo a similar process.  For this reason, the "return" inventory will contain a list of only the tangible items recovered from the premises.  Unless otherwise ordered by the Court, the return will not include evidence later examined by a forensic analyst.

Further Your Affiant sayeth not.

Steven Carrick
Special Agent
Federal Bureau of Investigation

Subscribed and sworn to before me this the ___1st___ day of February 2024, at Lawton, Oklahoma.

Shon T. Erwin
United States Magistrate Judge

## ATTACHMENT A

## PROPERTY TO BE SEARCHED

The entire property located at 1924 W Carolina Ave, Chickasha, Oklahoma 73018, including the residential building (the **SUBJECT PREMISES**) and vehicles parked in the driveway, which is within the Western District of Oklahoma.  The **SUBJECT PREMISES** to be searched is a one-story, single-family residence.  The house has red brick exterior walls, white trim, white shutters, and three white columns at the front porch.  The vehicles parked in the driveway are a black Ram pickup truck and a white Ford Explorer sport utility vehicle, both registered to RYAN.  There is a brown wooden shed at the rear of the property and a gray travel trailer-style recreational vehicle parked on the side of the property.

Photographs of the residence are shown below.





**ATTACHMENT B**

**PARTICULAR THINGS TO BE SEIZED**

The following materials, which constitute evidence of the commission of a criminal offense, contraband, the fruits of crime, or property designed or intended for use or which is or has been used as the means of committing a criminal offense, namely violations of Title 18, United States Code, Sections 2252 and 2252A (Receipt/distribution and possession of and access with intent to view child pornography):

1.     Computers or storage media used as a means to commit the violations described above.

2.     For any computer or storage medium whose seizure is otherwise authorized by this warrant, and any computer or storage medium that contains or in which are stored records or information that is otherwise called for by this warrant (hereinafter, "COMPUTER"):

   a.     Evidence of who used, owned, or controlled the COMPUTER at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, email, email contacts, "chat," instant messaging logs, photographs, and correspondence;

   b.     Evidence of software that would allow others to control the COMPUTER, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

   c.     Evidence of the lack of such malicious software;

   d.     Evidence indicating how and when the computer was accessed or used to determine the chronological context of computer access, use, and events relating to the crime(s) under investigation and to the computer user;

29

e.      Evidence indicating the computer user's knowledge and/or intent as it relates to the crime(s) under investigation;

f.      Evidence of the attachment to the COMPUTER of other storage devices or similar containers for electronic evidence;

g.      Evidence of programs (and associated data) that are designed to eliminate data from the COMPUTER;

h.      Evidence of the times the COMPUTER was used;

i.      Passwords, encryption keys, and other access devices that may be necessary to access the COMPUTER;

j.      Documentation and manuals that may be necessary to access the COMPUTER or to conduct a forensic examination of the COMPUTER;

k.      Records of or information about Internet Protocol addresses used by the COMPUTER;

l.      Records of or information about the COMPUTER's Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses; and

m.      Contextual information necessary to understand the evidence described in this attachment.

3.      Routers, modems, and network equipment used to connect computers to the Internet.

4.      Child pornography and child erotica.

5.      Records, information, and items relating to violations of the statutes described above including:

a.      Records, information, and items relating to the occupancy or ownership of the **SUBJECT PREMISES**, 1924 W Carolina Ave, Chickasha, Oklahoma 73018, including utility and telephone bills, mail envelopes, or addressed correspondence;

b.      Records, information, and items relating to the ownership or use of computer equipment found in the above residence, including sales receipts, bills for Internet access, and handwritten notes;

c.      Records and information relating to the identity or location of the persons suspected of violating the statutes described above;

d.      Records and information relating to the sexual exploitation of children, including correspondence and communications between users of the website described in the warrant application.

e.      Records and information showing access to and/or use of the website described in the warrant application.; and

f.      Records and information relating or pertaining to the identity of the person or persons using or associated with the username "RyanPipeliner" and/or screen name "R !".

As used above, the terms "records" and "information" includes all forms of creation or storage, including any form of computer or electronic storage (such as hard disks or other media that can store data); any handmade form (such as writing); any mechanical form (such as printing or typing); and any photographic form (such as microfilm, microfiche, prints, slides, negatives, videotapes, motion pictures, or photocopies).

The term "computer" includes all types of electronic, magnetic, optical, electrochemical, or other high-speed data processing devices performing logical, arithmetic, or storage functions, including desktop computers, notebook computers, mobile phones, tablets, server computers, and network hardware.

The term "storage medium" includes any physical object upon which computer data can be recorded, including external and internal hard drives, flash drives, thumb drives, micro SD cards, macro SD cards, DVDs, gaming systems, SIM cards, cellular phones capable of storage, floppy disks, compact discs, magnetic tapes, memory cards, memory chips, and other magnetic or optical media.

Law enforcement may utilize any form of biometric identification of Ryan Rudick onto any smartphone or tablet seized at the **SUBJECT PREMISES** in an effort to decrypt such device.